**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| APEX TOOL GROUP LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>CYDERES, LLC and FISHTECH GROUP, LLC,<br><br>        Defendants, | Case No: <u>3:23-cv-236</u><br><br>Judge:<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Apex Tool Group, LLC ("Apex"), brings this Complaint against CYDERES, LLC ("CYDERES") and Fishtech Group, LLC ("Fishtech," and collectively with CYDERES, the "Defendants"), and alleges as follows.

1.      This case is about Apex, a manufacturer of hand and power tools, paying and relying upon Defendants to provide "comprehensive" cybersecurity services, and Defendants utterly failing to monitor, detect, and rectify a series of large-scale cyberattacks launched against Apex over multiple weeks. Defendants promised to provide fulsome cybersecurity services to Apex and then entirely ***ignored*** numerous "high-level" alerts—a term ***defined by Defendants*** to mean an "active attack, or a threat to the client's business operations or environment"—that a system-wide intrusion was underway. Despite classifying these alerts as the highest-level threat to Apex—capable of "affecting critical systems or information with potential to be revenue or client impacting"—Defendants failed to timely respond to these alerts or even to notify Apex of them. While Defendants did nothing, a widespread and active attack was executed by cybercriminals against Apex's business operations. With Defendants asleep at the switch and Apex completely in the dark ***for weeks***, the attackers gained control of Apex's systems and deeply infiltrated

1

themselves such that by the time, weeks later, that the activity was discovered by Apex, it was too late. Defendants' reckless failures to abide by their own internal procedures, obligations to Apex, and even basic industry practices caused Apex to suffer the very thing Defendants had been hired to detect and prevent, causing substantial damages and losses to Apex's systems exceeding $25 million. Apex brings this lawsuit to hold Defendants accountable for their egregious breaches and gross negligence.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action in which Apex and Defendants are diverse, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      This Court has jurisdiction over Defendants because Defendants purposefully availed themselves of the privilege of acting in North Carolina by freely and intentionally entering into a contractual relationship with Apex, a North Carolina corporate resident, and performing under that contract. Moreover, the acts giving rise to liability and the consequences of Defendants' breach have a substantial connection to this state.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

5.      Apex is one of the largest manufacturers of professional hand and power tools in the world. Apex is a limited liability company formed under the laws of Delaware with its principal place of business in North Carolina. Apex has one member, which is a corporation incorporated under the laws of Delaware with its principal place of business in Delaware.

6.      CYDERES is a limited liability company formed under the laws of Missouri with its principal place of business in Missouri. On information and belief, CYDERES is owned by,

2

and has a single member, Herjavec Group, Inc., which is incorporated and has its principal place of business in Ontario, Canada.

7. In December 2021, CYDERES acquired Fishtech. On information and belief, through this transaction, CYDERES acquired all past, present, and future liabilities of Fishtech, and was assigned the rights and obligations of contracts that Fishtech had entered into prior to the transaction. In particular, on information and belief, the December 2021 acquisition included the assignment of Fishtech's agreements, including the Statement of Work that Fishtech signed with Apex described below, to CYDERES, and CYDERES therefore stands in place of Fishtech with respect to that Statement of Work.

8. Fishtech is a limited liability company formed under the laws of Missouri doing business in Missouri. On information and belief, the members of Fishtech are Gary Fish, who is a citizen of Belton, Missouri; Charles Crawford, who is a citizen of Lawrence, Kansas; Daniel Thormodsgaard, who is a citizen of Blaine, Minnesota; and Ryan Shreve, who is a citizen of Kansas City, Missouri.

## STATEMENT OF FACTS

**A.** **Defendants Induce Apex to Sign a Statement of Work by Falsely Representing That Defendants Were Capable of Providing Comprehensive Cybersecurity Services**

9. Before entering into a contract with Apex to provide services, Defendants provided Apex with a "Service Delivery Document," which purported to contain the services that Defendants were capable of offering. Apex's information technology team, which sits in North Carolina, reviewed that document to evaluate Defendants' service offerings and to decide whether Apex wanted to retain Defendants to provide those services.

10. In the "Service Delivery Document," Defendants touted themselves to Apex as "a[n] industry leading security organization" and a "24/7/365 staffed solution." Defendants offered

3

a "Security Operations Team" that would be "[r]esponsible for continuous monitoring and immediate response to a customer's environment based on available telemetry, data enrichment, and pre-defined response processes."

11.    To induce Apex to enter into a Statement of Work with Defendants, Defendants assured Apex that their services included detecting and monitoring for "Severity Level 1" or "High" alerts "affecting critical systems or information with potential to be revenue or client impacting." In summarizing the allocation of responsibilities between Apex and Defendants, Defendants explicitly stated that their services included being "Responsible" for monitoring and detecting, among other things:

- "Initial Access" – "The adversary is trying to get into your network"

- "Execution" – "The adversary is trying to run malicious code"

- "Defense Evasion" – "The adversary is trying to avoid being detected"

- "Discovery" and "Lateral Movement" – "The adversary is trying to figure out your environment"

- "Command and Control" – "The adversary is trying to communicate with compromised systems to control them."

- "Exfiltration" – "The adversary is trying to steal data"

- "Impact" – "The adversary is trying to manipulate, interrupt, or destroy your systems and data"

12.    Defendants stated that they had "standard" mitigations in place for threat detection, including "block[ing] users or groups from installing unapproved software" and "us[ing] intrusion detection signatures to block traffic at network boundaries." Defendants also represented that they would follow standardized "workflow[s]" in the event that a threat was detected, and that "Security Level 1" threats to "critical systems or information with [the] potential to be revenue or client impacting" would be subject to "expedited client escalation."

4

13.     Hiring a firm with 24/7/365 cybersecurity expertise, which Defendants represented they had, was critically important to Apex because Apex takes seriously its cybersecurity obligations and wanted to retain Defendants to provide specialized knowledge and experience, along with around-the-clock detection and response services.

14.     Defendants knew that Apex was looking to retain a highly experienced and capable cybersecurity firm and would have to significantly rely upon such a firm's expertise to monitor and protect Apex's network, and Defendants thus made the statements in the "Service Delivery Document" to induce Apex to agree to retain Defendants.

**B.     Defendants Agree to Provide Apex Comprehensive Cybersecurity Services**

**1.     Defendants' Service Offerings**

15.     Relying on Defendants' fraudulent representations that they were an "industry leading security organization" with "24/7/365" monitoring, Apex hired Defendants to provide cybersecurity services.

16.     Specifically, on December 18, 2020, Fishtech and Apex entered into a "Statement of Work" that set forth the services that Fishtech, through the "Fishtech CYDERES team," agreed to provide Apex. Apex executed the SOW in North Carolina. Although the SOW was nominally between Fishtech and Apex, the then-President of CYDERES, Eric Foster, executed the SOW on behalf of Fishtech.

17.     The SOW outlines in great detail the services that Defendants agreed to provide Apex.

18.     Under the SOW, Defendants were obligated to provide Apex with a "comprehensive security operations solution" and "visibility, detection and security operations capabilities over a corporate network environment that includes up to 3,200 employees."

19.     Defendants represented that their services "include[d] . . . 24x7x365 security operations, with the outcomes of 24x7x365 detection, investigation and escalation, which includes alerting and reporting." Defendants emphasized their "24x7x365" capabilities at least three times in the SOW, promising in another section of the SOW that Defendants "will provide 24x7x365 security operations experts to detect, assess and respond to security incidents in the scoped network environment." And again, Defendants promised elsewhere in the SOW that they "will provide 24x7x365 security operation experts powered by automation and orchestration to detect and assess security incidents in the scoped network environment."

20.     As explained below, Defendants provided none of these services. Instead of 24x7x365 cybersecurity support, Defendants collected Apex's payments under the SOW and provided grossly ineffective services.

21.     Defendants also stressed their own "proactive threat hunting" in the SOW. This includes Defendants' "resources proactively investigat[ing] the Client environment for opportunities for improvement in security architecture, configuration of operations, as well as 'hunting' for threats that have not yet tripped detective controls."

22.     In sum, Defendants agreed to provide fulsome, comprehensive cybersecurity services, including "alerting, response and reporting of security events detected in the Client's environment."

23.     As explained herein, Defendants provided none of these agreed-upon services.

**2.      Defendants' "Project Management" Obligations**

24.     The section of the SOW titled "Project Management" stated:

The goal of Project Management is to ensure that all aspects of the project are planned and executed in a manner that will lead to meeting the goals of the engagement to a high degree of Client satisfaction. Maintaining clear channels of communication will be necessary to ensure project success. Fishtech will provide immediate notification of issues requiring Client involvement and Fishtech expects

6

that any issues identified will be resolved promptly to avoid impacting the project timelines.

25. As explained herein, Defendants failed to adhere to their own "Project Management" representations.

### 3. Defendants' Obligations in the Event of a Security Incident

26. The SOW included a specific protocol for Defendants to follow if a security event or intrusion was detected. Shockingly, despite receiving multiple self-described "Security Level 1" notifications, which are the most serious level of cybersecurity threats because they constitute an active threat to Apex's business operations and network environment, Defendants *did nothing*.

27. Under the SOW, if Defendants detected a "[s]ecurity event" or "incident," "escalation[] to [Apex]" was "require[d]." Indeed, the SOW provides that Defendants "will provide immediate notification of issues requiring [Apex] involvement." The SOW broadly defines the in-scope monitored services as "any [Apex] compute[r] endpoint with an IP address observed within the Google Chronicle platform, e.g.[,] servers, desktops, laptops, virtual machine instances, network appliances, and/or security appliance[s]."

28. Defendants also agreed to take on a robust set of obligations concerning the timely review of any threats. Defendants were required to complete an "initial review of alerts generated from [Apex]" within "60 minutes." Upon completion of its initial review, Defendants were required to assign a "security level" designation to the alert ranging from "Security Level 1" (the most serious) to "Security Level 3" (the least serious). Based on the "security level" designation, differing "Time to Respond" and "Time to Resolve" duties were imposed on Defendants.

29. The "Time to Respond" was "measured from the time an alert [was] received by the Fishtech Cyber Defense Platform to the notification of [Apex] through pre-defined notification or escalation methods, e.g.[,] phone call, email, and/or text message." The "Time to Resolve" was

"measured from the time an alert [was] received by the Fishtech Cyber Defense Platform to the completion of agreed mitigation activities." All notifications from Defendants were to be routed through a North-Carolina-based Point of Contact ("POC") on Apex's information technology team.

30. A "Security Level 1" designation was required for an "[i]ncident affecting critical systems or information with potential to be revenue or client impacting. These are incidents the [CYDERES Global Security Operations Center] believes represent a possible compromise, an active attack, or a threat to the client's business operations or environment."

31. In the event of a "Security Level 1" designation, Defendants were required to notify Apex's North-Carolina-based POC within two hours and resolve the alert within six hours.

32. A "Security Level 2" designation was required for an "[i]ncident affecting non-critical systems or information, not revenue or customer impacting. . . . Activity with limited impact to the business but representing possible threat or a rudimentary attack attempt that does not compromise the customer's environment[,] e.g., serious reconnaissance attempts and unsuccessful attacks."

33. In the event of a "Security Level 2" designation, Defendants were required to notify Apex's North-Carolina-based POC within eight hours and resolve the alert within 48 hours.

34. A "Security Level 3" designation was required for a "[p]ossible incident [to] non-critical systems," "[i]ncident or employee investigations that are not time sensitive," "[l]ong-term investigations involving extensive research and/or detailed forensic work," and "[r]eal event(s) that should not have an immediate impact on the network[,] e.g., poor security practices and soft reconnaissance activities."

8

35.     In the event of a "Security Level 3" designation, Defendants were required to notify Apex's North-Carolina-based POC within 72 hours (three days) and resolve the alert within 120 hours (five days).

36.     Defendants "represent[ed] and warrant[ed] that (i) [they would] perform the Services as described in the [SOW] using personnel of required skill, experience and qualifications and (ii) [they would] perform such Services in a professional and workmanlike manner with commercially reasonable industry standards for similar services."

37.     As explained herein, Defendants received numerous "High Alerts" that a cyberattack was underway, which are similar to a "Security Level 1" designation. Defendants did nothing, thereby failing to address these security concerns within the "response" and "resolve" timeframes.

### 4.     Defendants' Significant Compensation for These Services

38.     In exchange for all of these agreed-upon services, Apex agreed to compensate Defendants $900,200 over the term of the SOW. Apex fulfilled its obligations to pay Defendants pursuant to the SOW.

### C.     Typical Steps to a Cyberattack

39.     While variations exist, cybercriminals often take the following steps in executing a cyberattack. In general, those steps include:

- **Initial Compromise:** Access is gained to an internal network through exploiting a vulnerability, such as a phishing email, compromised website, or compromised user account.

- **Internal Reconnaissance:** Once access is gained, credentials are taken and the network is scanned to identify points of exploitation.

- **Delivery:** Transmission of malware to targets via email, USB, or website.

- **Installation:** Installation of malware on the system.

9

- **Command-and-Control:** Establishment of a persistent remote connection to the network.

- **Lateral Movement:** With an established position, the cybercriminal seeks to compromise additional systems and identify sensitive information.

- **Desired Actions:** With the cyberweapons delivered and installed, and the target's network under control, the cyberattack objectives are carried out.

40. During the weeks-long cyberattack that was launched against Apex, Defendants received "High Alert" notifications that an attack was underway during nearly all of these steps. If Defendants had intervened, or at least notified Apex, the attack could have been stopped. But Defendants did nothing.

**D. February 21, 2022: Defendants Fail to Detect, Respond, and Notify Apex of the Threat Actor's Initial Intrusion**

41. On February 21, 2022 at approximately 10:24 a.m. UTC, an unauthorized user on the Apex environment accessed a compromised website and downloaded and decompressed a zip file, which in turn executed a malicious JavaScript file. The malicious payload began internal reconnaissance of Apex's systems and network architecture and, at approximately 11:02 a.m. UTC, the malware embedded a "BLISTER" loader into Windows libraries and processes. A BLISTER loader is used in the early phase of an intrusion to load malware necessary to effectuate the attack.

42. This initial intrusion was detected by Defendants and ***triggered a High Alert*** that was tracked within Defendants' security monitoring system on February 21, 2022. Despite their representations and duties to monitor, detect, respond, and notify Apex of any security threats, Defendants did absolutely nothing. This inaction was inexcusable, a flagrant breach of the SOW, and constituted gross negligence.

43. With Defendants sleeping at the wheel, from February 21, 2022 to March 7, 2022, the attacker proceeded unimpeded to map the Apex network, exfiltrate Apex data, deactivate anti-virus and other defensive measures, and sell Apex network credentials to other threat actors. In the

most fundamental sense, Defendants failed to take any of the protective measures they agreed to take in the SOW.

**E.     March 7 and 8, 2022: Defendants Ignore More "High Alerts"**

44.     On March 7, 2022, the threat actor performed additional internal reconnaissance measures to expand the scope of the infiltration of Apex's network. These actions ***triggered a second "High Alert"*** to Defendants. But once more, Defendants did nothing. No remedial action was taken and Apex was not notified of this activity. The threat actor continued to carry out its attack without interruption.

45.     On March 8, 2022, the threat actor performed additional internal reconnaissance and executed RoboCopy commands on the network to stage additional data for exfiltration. This triggered a ***third "High Alert."*** Yet again, Defendants did nothing.

**F.     March 9, 2022: Apex Receives Its First Alert from Defendants—But the Alert Is Limited to Four Isolated Issues and Fails to Provide Apex Notice of the Systematic Intrusions Underway Since February 21, 2022**

46.     On March 9, 2022 at 8:58 p.m. UTC, Apex's North-Carolina-based POC received ***the first and only*** alert from Defendants. This was ***16 days*** after Defendants received the first High Alert that a cyberattack was underway. The March 9, 2022 notification did ***not*** notify Apex of the large-scale cyberattack that had been ongoing for weeks.

47.     Despite the three unaddressed, and non-communicated, "High Alert" security events that had been logged by Defendants, Defendants' notification to Apex on March 9, 2022 flagged just a "***Medium Alert***" that identified ***four isolated systems*** that had been impacted, and failed to communicate to Apex the system-wide attack that had been underway for weeks. Indeed, by the time Defendants issued this isolated Medium Alert, the threat actor had already comprehensively compromised Apex's systems.

11

48.     Apex's North-Carolina-based information technology team responded to the specific information it was given in the isolated Medium Alert, but Apex was unable to respond to the larger attack underway because Defendants failed to provide information about the High Alert attacks to Apex when they were first detected, allowing the attackers to gain a strong foothold in the Apex environment. Knowing only what Defendants chose to communicate, and unaware of the extensive infiltration happening within its system, Apex worked to remediate the vulnerabilities on the four systems identified by Defendants. As far as Apex knew, based upon Defendants' communications, when Apex closed the Medium Alert, there were no other infiltrations or intrusions detected by Defendants that posed a threat to Apex.

49.     Unknown to Apex because of Defendants' reckless failures, by this point, however, the threat actor had already permeated Apex's network and was continuing to lay the groundwork for the final step of the attack. Apex remained unaware of the threat until 6:41 a.m. UTC on March 11, 2022, when **Apex** discovered the attack **on its own**, with no guidance or assistance from Defendants.

## G.     Apex Loses Millions of Dollars as a Result of Defendants' Wrongdoing

50.     On March 11, 2022, the threat actor executed a LockBit 2.0 ransomware attack (the "Final Incident") across much of the Apex corporate network environment. LockBit 2.0 ransomware is malicious software designed to block user access to computer systems, and that access is then restored only after a ransom payment is made. LockBit searches for valuable targets, spreads the infection, and encrypts all accessible computer systems on a network. Apex's impacted databases, networks, and devices were all within the scope of the SOW.

51.     Even after Lockbit was executed, Defendants failed to communicate the threat to Apex; rather, in a reversal of the parties' obligations under the SOW, at 7:41 a.m. UTC, Apex **notified** Defendants of the Final Incident.

52.     If responded to in a timely manner, Apex would have been able to remediate and eradicate the threat prior to deployment of LockBit across its environment. Defendants simply had to do their job—as promised over and over again in the SOW and as inducement to enter into the SOW.

53.     As a result of Defendants' failures, between March 11, 2022 and March 30, 2022, Apex's corporate network was almost entirely inoperable, including critical manufacturing, payroll processing, and communication functionality. Even upon regaining access to its network, Apex incurred significant costs and losses in restoring system operability, in addition to costs associated with analyzing the Final Incident under relevant privacy and data-breach notification laws.

54.     As alleged herein, Defendants engaged in willful intentional misconduct in failing to monitor, detect, and rectify a series of large-scale cyberattacks launched against Apex over multiple weeks.

55.     To date, Apex has incurred approximately $25 million in losses as a direct and proximate result of Defendants' incompetence, breach, and gross negligence.

<u>**COUNT ONE**</u>
**Fraudulent Inducement**

56.     Apex realleges the allegations set forth in paragraphs 1 to 55 above and incorporates the same herein by reference.

57.     Prior to entering the SOW, Defendants represented in a "Service Delivery Document" that they were "a[n] industry leading security organization" and promised to offer a "24/7/365 staffed solution" that would monitor and alert Apex of "Severity Level 1" or "High" alerts "affecting critical systems or information with potential to be revenue or client impacting." Defendants stated they would promptly provide "Security Bulletin[s]" and notification to Apex

13

"when a vulnerability or a threat is discovered through open source, third party, or organic intelligence."

58.     To induce Apex to enter into the SOW with Defendants, Defendants also explicitly stated that their services included being "Responsible" for monitoring and detecting, among other things:

- "Initial Access" – "The adversary is trying to get into your network"

- "Execution" – "The adversary is trying to run malicious code"

- "Defense Evasion" – "The adversary is trying to avoid being detected"

- "Discovery" and "Lateral Movement" – "The adversary is trying to figure out your environment"

- "Command and Control" – "The adversary is trying to communicate with compromised systems to control them."

- "Exfiltration" – "The adversary is trying to steal data"

- "Impact" – The adversary is trying to manipulate, interrupt, or destroy your systems and data"

59.     Defendants further stated that they had "standard" mitigations in place for threat detection, including "block[ing] users or groups from installing unapproved software" and "us[ing] intrusion detection signatures to block traffic at network boundaries." Defendants promised that they would follow standardized "workflow[s]" in the event that a threat was detected, and that "Security Level 1" threats to "critical systems or information with [the] potential to be revenue or client impacting" would be subject to "expedited client escalation."

60.     These representations were false. Defendants knew they lacked the ability to perform the comprehensive services they touted, but represented that they did anyway to gain Apex's trust and business. Apex reasonably relied on these claims because Defendants continuously touted themselves as experts in the cybersecurity business. In fact, Apex hired

14

Defendants because Apex itself is not a cybersecurity firm and relied upon the purported expertise, knowledge, and proficiency of Defendants to deliver the services as represented.

61. As a result of Defendants' false statements, Apex entered into the SOW with Defendants and relied upon Defendants to monitor, detect, and notify Apex of threats to its systems—all services that Defendants failed to provide. Because of Defendants' false statements, and its efforts to induce Apex to enter into the SOW, Apex relied upon a grossly incompetent firm for its critical cybersecurity needs. In turn, following Defendants' failure to monitor, detect, and notify Apex that a weeks-long cybersecurity attack was underway, Apex suffered substantial damages.

62. To date, Apex has incurred approximately $25 million in losses as a direct and proximate result of Defendant' fraudulent conduct.

## COUNT TWO
### Breach of Contract

63. Apex realleges the allegations set forth in paragraphs 1 to 55 above and incorporates the same herein by reference.

64. The SOW is a valid contract and, pursuant to that agreement, Apex and Defendants were in a contractual relationship.

65. Apex performed all of its obligations under the SOW, including paying for the services for which it contracted and providing all information necessary to Defendants for Defendants to perform their obligations under the SOW.

66. Defendants breached their duty to detect and report security events on February 21, 2022, when they failed to report a High Alert security event on Apex's systems.

67. Defendants breached their duty to detect and report security events on March 7, 2022, when they failed to report a High Alert security event on Apex's systems.

68.    Defendants breached their duty to detect and report security events on March 8, 2022, when they failed to report a High Alert security event on Apex's systems.

69.    Defendants breached their duty to detect and report security events on March 9, 2022, when they incorrectly reported the Medium Alert and failed to report the prior High Alert security events on Apex's systems.

70.    Defendants breached their duty to detect and report security events on March 11, 2022, when they failed to monitor, detect, respond, or notify Apex of the attacker executing the Final Incident.

71.    If Apex had been timely notified of the security events, it would have been able to remediate and eradicate the threat prior to deployment of malicious software across its environment. Thus, Defendants' breaches were a direct and proximate cause of Apex's corporate network being almost entirely inoperable between March 11, 2022 and March 30, 2022.

72.    To date, Apex has incurred approximately $25 million in losses as a direct and proximate result of Defendant' egregious breach.

## <u>COUNT THREE</u>
**Breach of Express Warranty**

73.    Apex realleges the allegations set forth in paragraphs 1 to 55 above and incorporates the same herein by reference.

74.    The SOW is a valid contract and, pursuant to that agreement, Apex and Defendants were in a contractual relationship.

75.    As part of the SOW, Defendants "represent[ed] and warrant[ed] that (i) [they would] perform the Services as described in the [SOW] using personnel of required skill, experience and qualifications and (ii) [they would] perform such Services in a professional and workmanlike manner with commercially reasonable industry standards for similar services."

16

76.     The SOW, as well Defendants' representations regarding their capabilities and protection of Apex's information systems, created a duty of care upon which Apex relied.

77.     Defendants breached this express warranty. Defendants' complete failure to monitor, detect, respond, or notify Apex after Defendants received ***multiple High Alerts*** that a coordinated, high-stakes cyberattack that threated Apex's entire company was underway cannot, under any circumstances, be deemed "professional and workmanlike" or meet "commercially reasonable industry standards for similar services."

78.     If Apex had been timely notified of the security events, it would have been able to remediate and eradicate the threat prior to deployment of malicious software across its environment. Thus, Defendants' breach was a direct and proximate cause of Apex's corporate network being almost entirely inoperable between March 11, 2022 and March 30, 2022.

79.     To date, Apex has incurred approximately $25 million in losses as a direct and proximate result of Defendants' breach.

## COUNT FOUR
### Negligence

80.     Apex realleges the allegations set forth in paragraphs 1 to 55 above and incorporates the same herein by reference.

81.     As a professional cybersecurity firm that repeatedly represented to Apex its 24/7/365 competence, experience, and commitment to clients, Defendants had a duty to accurately represent the scope of cybersecurity services they could provide and also competently provide those services. There was a foreseeable risk that Defendants' failure to take reasonable steps and provide competent cybersecurity services could lead to a cyberattack rendering Apex's computer systems inoperable and creating millions of dollars in damages. Defendants breached this duty by

17

misrepresenting the scope of services they could provide and the quality of the performance they could deliver.

82.　　Defendants also breached their duty to take reasonable precautions to monitor and safeguard Apex's information-technology systems and network on February 21, 2022, March 7, 2022, March 8, 2022, March 9, 2022, and March 11, 2022 when Defendants (i) turned off Defendants' notification system so that any alerts generated by an ongoing cyberattack launched at Apex would not be seen; (ii) failed to detect, fix, and alert Apex to the fact that the notification system for detecting ongoing cyberattacks had been tampered with or disabled; and/or (iii) otherwise failed to take any action to discover and remedy the ongoing cyberattack, as alleged herein. Indeed, through these actions, Defendants effectively created a situation where no notifications would be received, reviewed, and/or acted upon for any impending attack on Apex. This breach was extreme because it completely exposed Apex to any cyberattacks and Apex relied entirely upon Defendants for cybersecurity services.

83.　　It was foreseeable that such obviously inadequate and willful actions would render Apex vulnerable to cyberattacks.

84.　　Defendants' breaches of duty were a direct and proximate cause of Apex's corporate network being almost entirely inoperable between March 11, 2022 and March 30, 2022.

85.　　To date, Apex has incurred approximately $25 million in losses as a direct and proximate result of Defendants' gross negligence.

**COUNT FIVE**
**Gross Negligence**

86.　　Apex realleges the allegations set forth in paragraphs 1 to 55 above and incorporates the same herein by reference.

18

87.     As a professional cybersecurity firm that repeatedly represented to Apex its 24/7/365 competence, experience, and commitment to clients, Defendants had a duty to accurately represent the scope of cybersecurity services they could provide and also competently provide those services. There is a foreseeable risk that Defendants' failure to take reasonable steps and provide competent cybersecurity services could lead to a cyberattack rendering Apex's computer systems inoperable and creating millions of dollars in damages. Defendants breached this duty by misrepresenting the scope of services they could provide and the quality of the performance they could deliver.

88.     Defendants also breached their duty to take reasonable precautions to monitor and safeguard Apex's information-technology systems and network on February 21, 2022, March 7, 2022, March 8, 2022, March 9, 2022, and March 11, 2022 when Defendants (i) turned off Defendants' notification system so that any alerts generated by an ongoing cyberattack launched at Apex would not be seen; (ii) failed to detect, fix, and alert Apex to the fact that the notification system for detecting ongoing cyberattacks had been tampered with or disabled; and/or (iii) otherwise failed to take any action to discover and remedy the ongoing cyberattack, as alleged herein. Indeed, through these actions, Defendants effectively created a situation where no notifications would be received, reviewed, or acted upon for any impending attack at Apex. This breach was extreme because it completely exposed Apex to any cyberattacks and Apex relied entirely upon Defendants for cybersecurity services.

89.     It was foreseeable that such obviously inadequate and willful actions would render Apex vulnerable to cyberattacks.

90.     Defendants' willful and wanton misconduct proximately harmed Apex. Indeed, Defendants' utter failure to monitor, detect, remedy, and notify Apex constituted actions taken for

a deliberate purpose to expose Apex to large-scale cyberattacks and manifests a reckless indifference to the rights of Apex.

91.     Defendants' breaches of duty were a direct and proximate cause of Apex's corporate network being almost entirely inoperable between March 11, 2022 and March 30, 2022.

92.     To date, Apex has incurred approximately $25 million in losses as a direct and proximate result of Defendants' gross negligence.

**COUNT SIX**
**Unjust Enrichment**

93.     Apex realleges the allegations set forth in paragraphs 1 to 55 above and incorporates the same herein by reference.

94.     Apex conferred a measurable benefit on Defendants in the form of payment for Defendants' services, and Defendants were aware of and consciously accepted this benefit.

95.     Retention of this payment would be unjust because it was conferred for the performance of services and Defendants failed to perform the most basic reporting obligations required of them under the SOW.

96.     As of the date Apex learned of Defendants' material breach of their reporting obligations, Apex had paid Defendants $670,741.50 for their services.

**PRAYER FOR RELIEF**

97.     WHEREFORE, Apex prays for the following relief:

  a.     On Counts One through Five, awarding damages in favor of Apex, in an amount to be determined at trial, but in no event less than $25 million, plus, to the extent available, any pre-judgment interest, attorneys' fees, and costs;

  b.     On Count Six, awarding damages in favor of Apex, in an amount to be determined at trial, but in no event less than $670,741.50, plus, to the extent

20

available under law, any pre-judgment interest, attorneys' fees, and costs; and

c.     Such further and other legal and equitable relief as the Court may deem just and necessary under the circumstances.

Dated:   April 25, 2023

By:  <u>/s/ Steven Grimes</u>
Steven Grimes (*pro hac vice* forthcoming)
Thomas Weber (*pro hac vice* forthcoming)
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
Tel.: (312) 558-5600
Fax: (312) 558-5700
sgrimes@winston.com
tgweber@winston.com

Gretchen Scavo
NC Bar No. 48589
**WINSTON & STRAWN LLP**
300 S. Tryon Street
Charlotte, North Carolina 28202
Tel.: (704) 350-7785
Fax: (312) 558-5700
gscavo@winston.com

21